Huger, J.

before whom the case was tried, told the jury to give interest; but on his return to court after a temporary adjournment, stated to the parties, that he had done, ■wrong, and recommended this appeal.
Nott, J.
The circuit judge I understand changed bis opinion in this case, upon the case of Knight and Mitchell, (2 Const. Rep. Tread. Ed. 668.) But that was not a written agreement like the present; and a distinction has always been made with regard to interest, between written and parol agreements. (See Gordon vs. Swan, 2 Campbell 429.) It may be an arbitrary one, but it has been sanctioned by actual practice and ought not now to be changed by the court.
Every person acquainted with the situation of this country., immediately after the revolutionary war, will recollect that from the scarcity of specie and having no banks at that time, the commerce of the country was carried on almost entirely by barter. Contracts were made for the delivery of tobacco, corn, pork, and almost every commodity which the country was capable of producing. From the general prevalence of contracts of that sort it became a settled rule of decision to allow the value of the article at the time it was to be delivered, with the interest upon it as the measure of damages for the non-performance of the contract. Indeed,the law was considered so well settled, that verdicts passed and judgments were confessed in that way, and it was not thought that it admitted of a question. But as few of the decisions of that day have been reported, and contracts of that sort having in a great measure fallen into disuse, those decisions have never been known to many, and appear to have been forgotten by others. But we are not left entirely without testimony upon the point. In the case of Duvic vs. The Ex’ors of Richardson, (1 Bay 102.) Atkinson vs. Scott, (Do.303.) and Wigg vs. TheEx’ors. Gordon, (Do.351,)itis laid down that wherever a contract is entered into for the delivery of a specific article the value of that article at the time fixed for the delivery with interest is the sum the plaintiff *500 ought to iecover. According to the principle decided iu. those cases the verdict in this case ought to be supported,, and I do not know upon what principle we are authorized to depart from those decisions. They were made upon due deliberation, and by the highest tribunals in the country. But, as the question of interest has long been qucstijvexaia iu this state, I have no objection to go more' at large into the subject and think these cases can be supported upon principle as well as authority.
It is desirable that some principle should be established by which the question may be put to rest. Campbell, in the first volume of his Reports 52, says it would, fortunately, be a very difficult matter to fix upon another point of English law in which the authorities are so little in harmony with each other. Lord Ellenborough, in the case of de Haveland vs. Bowerbank, (1 Campbell 50,) says he wishes very much to lay down some certain rule respecting the payment of interest; that his great object was to have a fixed rule and to exclude discretion. And I concur in the opinion, that it is a subject which ought to be fixed upon some certain and stable foundation, and not to be left to the discretion of every judge, and much less to the fluctuating and capricious opinions of juries. The great object of courts ought to be to fix principles and not merely to decide cases By tracing up the history of this subject, we shall find, that determining in what cases interest shall or shall not be allowed has always been a matter of judicial cognizance. I do not recollect a single act in the voluminous code of G. B. declaring in what cases it may or may not be recovered. There may be many, but if so they have escaped my recollection. Neither do I recollect one in this state. The payment of interest was originally altogether a matter of contract and not of legislative provision. All legislative acts have been directed to the restraining the excess of interest. There is a late act authorizing sheriffs to collect interest on executions as a matter of course. But the courts had previously determined that the jury might give *501 interest on judgments, and the only effect of the act was to make it recoverable without an action. There is also an act authorizing a purchaser ofland in cases of eviction on a title paramount to recover back the purchase money with interest. But that was merely recognizing a rule previously established both in England and in this state; and the object of the legislature was not to authorize the party to recover interest, but to establish a rule beyond which the jury could not go 3n estimating damages.
We all know the prejudices which formerly existed •against taking interest at all. Almost all judicial power was usurped by the clergy, who thought or pretended to think it a crying sin. The judges of the King’s bench were them•selves principally ecclesiastics. And when the nobles of France attempted to emancipate themselves from ecclesiastical power they excepted heresy, marriage and usury. as being of spirit--ual cognizance (1 Hallam's id. Ages, 466-7.) iXo distinction was then made between usury and interest. By the ancient canons of'the church interest was prohibited to all persons having any employment in the church. The Emperor Leo went further, and prohibited it altogether. St. Cyprian reckoned it among the most grievous sins. St. Chrysostom said that money gained by usury and given in charity and alms was no more acceptable to God, than if it was so much received from the stews, the price of lewdness and prostitution. But this opposition was not confined to the clergy, it was almost universal. Interest was at one time prohibited at Rome, under severer penalties than theft. (Domat, 123. Ord On Usury, 4.) The English law was not less severe (Do. 7.) It was considered an aggravated species of felony. Lord C. J. de Grey says, that before the St. 3. Hen. 8 c. 9, taking of interest was prohibited by the common law, the canon law, and the ancient statutes of the realm. (3 Willson, 260.) Loyd qui tam. vs. William’s. Moses was not quite so rigid. He prohibited his people to exact usury from their bre~. threu; but they were allowed to take it of strangers.
*502 Many reasons were given for those prohibitions. The-clergy, we have seen, considered it uncharitable and sinful. Aristotle said that interest ought not to be required, because-money does not breed. But if that sage philosopher had lived to this day he would have found, that iu the hands of an enterprising merchant it is a very prolific thing. But the truth is, they had not then learned the distinction, which has since been made, between usury and interest. Governments ■ had not begun to regulate the price of money. It was alto - gether a matter of contract. And the oppressive extortion of the money lenders produced mischiefs of which we have no idea at this day. Tacitus says it was one of the principle causes of insurrection at Rome. It was one of the principal grievances which Solon had to redress, when he formed his Athenian code — one which had kept many of the citizens iu exile, until they had forgotten their native dialect. (Plutarch’s Life of Solon.)
Cicero says, that the interest of money in his time was 40 per cent, at Rome, and in the provinces 48. (Montesquieu &>p. L. 100.' in Spain it was 40 per ct. until reduced by' the Emperor Charles V. (Rob. Hist.) And, in England, Jewish interest,' or biting interest, as (■. J. Lee called it, was 4-0 percent. and more. ■ Hardres. 429.) Thus was this mighty evil extending itself all over Europe. Government had not yet undertaken to regulate the price of money. Interest was whatever the avarice of the lender might induce him to exact, and the necessities of the borrower compelled him to pay; until the people were overwhelmed with all the distress that the indulgence of such unrestrained cupidity might be expected to produce. But the state of the world is changed. By the extension of commerce the use and value of money are better understood. Interest is regulated bylaw and the hire of money is as legitimate a source of income as any trade or .commerce. It is' no longer necessary to provide expressly for the payment of interest, as we every day see in the cases of bonds, promissory notes, and bills of *503 exchange. But it is left to the court ; to determine whether the contract is of such a nature as to carry interest; that is to say, to establish some‘principle which shall be applicable to all cases, it seems to be implied from the breach of a written promise to pay money on a given day thatthe party will pay interest. Why the same implication should not arise from the breach of a parol promise is perhaps the most difficult to discover. But a distinction appears to have been made and I am not disposed to innovate upon established doctrine.
1 will now look back to our own decisions, and as far as they have gone, we are now certainly authorized to go. it is admitted, that on bonds, bills of exchange and promissory notes, interest is recoverable as a matter of course. Í have shewn by the cases from Bay’s Reports, that for the breach of a written promise to deliver any specific article interest may be recovered, it has been allowed on judgments. The adm’rs. of Norwood vs. Manning. (2 Nott & M'Cord,395.) Fishburn vs. Sanders. (1 Do. 242.) It has been allowed in an action for money had and received, money laid out and expended, &c. Goddard & Bulow, (Nott & M’Cord, 45;) and on a replevin bond, Stevens vs. Simmons, (1 M’ Cord, 8.)
It has sometimes been said that-a jury may in their discretion give interest by way of damages, but that it is not recoverable as a matter of course. On that subject I have only to remark, that when it is once settled by the court that the contract is of such a nature as to carry interest, it then becomes a rule of law, and is no longer a matter of discretion. (The very object in laying down a rule is to narrow the field of distinction, and when a rule for the estimation of damages is established by law, the jury are not at liberty capriciously to adopt or reject it as they may think proper. ^ [ do not mean to say that they must at all events give interest. There is no discription of cases where causes may not exist to suspend interest. A tender of the principal, the absence of the party, the intervention of war, &c. are good causes for suspending the payment of interest in any case. But it is not a *504 matter of discretion. It must depend upon some legal principle.
It is said, that if interest is recoverable at all, it cannot be so eo nomine, but it must be by way of damages only. That is a question on which my mind has oscillated. But when we consider the difficulties with which this subject has had to contend and the prejudices it had to encounter and the slow and almost imperceptible steps with which its progress has' been marked, we ought not to be surprised that many doubts have sprung up in its course. In most of the cases, to which I have referred, interest has been expressly allowed as such. In some it has been doubtfully expressed, but in none has the contrary been expressly laid down. But why may not interest be allowed by the name of interest as well as by way of damages? Every action of assumpsit is an action for damages for the breach of a contract. Interest is always given by way of damages, yet we have seen that on notes of hand,, hills of exchange and for money had and received, &c. it may be given under the name of interest. And 1 can see no reason why it may not. be in every case of a contract for the delivery of property or the payment of money whether express or implied. The verdict is equally certain as if a gross amount of damages had been given. And when the substance is gone, why should we be anxious to preserve the shadow. Since the interest constitutes the amount of damages, and the only damages which can be given, it cannot be expressed in a more simple and intelligible form. If the law is a science, we ought to indulge the hope, that, like the other seiencies, it is marching on toward perfection. And it certainly is one step towards the main object of our pursuit. Let us endeavour to finish one work as we go on, that we may not be perpetually called back to do the same thing over and over again. Let us establish principles and leave as little as possible to discretion. The principle is indeed established by the cases which I have cited, and a jury would not be permitted to adopt a different rule, *505 A jury would not be permitted to give less than the value of the property, as we have already decided in this court, in the case of Wise Freshly. /Nor would they be permitted to give an arbitrary sum, over and above the value of the property; as for instance five or ten per cent,. They must measure their damages by the legal rate of interest or nothing.^ The only question is then, is the verdict sufficiently certain. On that question I apprehend there can be no doubt. The principle may be tested by the manner sometimes adopted in actions of trover. It is not unusual to give a verdict for the value of a negro, for instance, and a further sum for his services, instead of a,gross sum. Such a verdict is informal, but it is, notwithstanding, sufficiently certain. So if a jury should give a verdict for the value of a negro and his services for three years, at the rate of one hundred dollars per year, Í presume the court would not grant a new trial, on the ground of such informality. If therefore the verdict in this case is informal, it is not uncertain and may be supported. The motion therefore must be- refused.
Glover, for the motion.
Felder, contra.

.) J If the reader is curious to know more about the absurdi- • ties in the Old English law in relation to usury, let him look at Glan-■ville, Book, VII. ch: XVI. page 18S of Beames’ Ed: and Beames* note, (1) to that page. The controlling maxim was, quod usura ■vadix omnium -oitiorum esset.